**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**


<u>Universal Am-Can, Ltd.</u>

    v.                                                  Civil No. 11-cv-030-LM
                                    Opinion No. 2012 DNH 047
<u>CSI-Concrete Systems, Inc.</u>


**O R D E R**


Universal Am-Can, Ltd. ("Universal") has sued CSI-Concrete
Systems, Inc. ("CSI") in five counts, asserting claims based on
CSI's refusal to pay a fuel surcharge Universal included on
invoices it presented to CSI for hauling 275 loads of concrete
forms from New Hampshire to Wisconsin.  Specifically, Universal
asserts claims for: breach of contract (Count I), quantum meruit
(Count II), restitution/unjust enrichment (Count III),
attorney's fees and costs (Count IV), and violation of the New
Hampshire Consumer Protection Act ("CPA") (Count V).  CSI
asserts counterclaims for: violation of the CPA (Count I),
breach of the implied covenant of good faith and fair dealing
(Count II), and misrepresentation (Count III).  Before the court
is Universal's motion for summary judgment on all five of its
claims and all three of CSI's counterclaims.  CSI objects.  For
the reasons that follow, Universal's motion for summary judgment

is denied as to its own claims but granted as to CSI's counterclaims.

## Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "The object of summary judgment is to 'pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" Dávila v. Corporación de P.R. para la Diffusión Pública, 498 F.3d 9, 12 (1st Cir. 2007) (quoting Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 7 (1st Cir. 2004)). "[T]he court's task is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009) (citations and internal quotation marks omitted).

"Once the moving party avers an absence of evidence to support the non-moving party's case, the non-moving party must offer 'definite, competent evidence to rebut the motion,'" Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009) (citing Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)), and "cannot rest on 'conclusory allegations, improbable inferences, [or] unsupported speculation,'" Meuser, 564 F.3d at

515 (quoting Welch v. Ciampa, 542 F.3d 927, 935 (1st Cir.

2008)).  When ruling on a party's motion for summary judgment, a

trial court "constru[es] the record in the light most favorable

to the nonmovant and resolv[es] all reasonable inferences in

[that] party's favor."  Meuser, 564 F.3d at 515 (citing

Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38

(1st Cir. 2002)).

### Background

Unless otherwise indicated, the following facts are

undisputed.

In September of 2008, in an e-mail from Steven Coughlin to

Len Worden, Universal offered to haul 40,000-pound loads of

concrete forms for CSI at the following rate:

> $ 1475.00 per load including FSC as long as fuel does
> not go over $ 4.35 per gallon on the National Average
> [a]s posted on Monday of each week by the Department
> of Energy.  If this should happen an agreed upon
> increase will be negotiated.

Def.'s Obj., Falco Aff., Ex. A (doc. no. 18-1), at 7.  When

Universal made the foregoing offer, fuel prices were in the

vicinity of $4.20 per gallon.  See id., Ex. B (doc. no. 18-2).

CSI did not accept Universal's offer.  Approximately six weeks

later, Coughlin sent Worden another e-mail acknowledging a drop

in fuel prices and offering a lower rate:

> $ 1,430.00 per load including FSC as long as fuel does
> not go over $ 3.80 per gallon on the National Average

> as posted [o]n Monday of each week by the D.O.E.  If
> Fuel does exceed the $ 3.80 per gallon we would have
> to increase the price [p]er load to a reasonable level
> as we would agree upon . . .

Id., Ex. A, at 7.  When Universal made its second offer, fuel

prices were in the vicinity of $3.50 per gallon.  See id., Ex.

B.  CSI did not accept Universal's second offer.

In May of 2009, Coughlin e-mailed Worden again, with

another offer:

> After review of our last proposal and discussions with
> Louis Falco and of course the conditions in the
> transportation industry as a whole I have re-assessed
> our rate structure on the possible upcoming moves to
> Milwaukee, WI and wanted to share this with you.
> Based on the reduced fuel costs and the overall
> economy I feel comfortable that we can provide
> transportation from your Facility in Londonderry NH to
> Milwaukee, WI at the following rate
>
> **$ 1360.00 per load** including Fuel as long as the fuel
> stays at a level under $ 2.22 per gallon national
> average as posted each Monday by the D.O.E.

Falco Aff., Ex. A (doc. no. 18-1), at 10-11 (emphasis in the

original).  Universal and CSI entered into an agreement on those

terms.  When they did so, the price of fuel was $2.185 per

gallon.  See Mot. Summ. J., Ex. A, First Boussie Aff. (doc. no.

17-2) ¶ 21.

Universal hauled its first load for CSI on November 10,

2009.  See Mot. Summ. J., Ex. D (doc. no. 17-5), at 4.  At that

time, the cost of fuel was in the vicinity of $2.80 per gallon.

See Falco Aff., Ex. B (doc. no. 18-2).  For loads delivered

4

between November of 2009 and February 9, 2010, Universal invoiced CSI at the rate of $1,360 per load.

On February 9, 2010, the price of fuel was $2.769 per gallon.  See First Boussie Aff. (doc. no. 17-2) ¶ 22.  That same day, Coughlin had a conversation with CSI's Project Manager, Louis Falco, concerning Universal's need to impose a fuel surcharge on all loads shipped thereafter.[1]  Regarding the content of that conversation, Universal has produced an affidavit from Melissa Boussie, an employee in Universal's accounts-receivable department.  She states:

> On or about February 9, 2010, I was informed by Steve Coughlin that a 15% fuel surcharge was to be added to CSI's invoices going forward.
>
> I was later informed by Mr. Coughlin that when he told CSI that it would be necessary to institute fuel surcharges, that the Project Manager, Louis Falco, agreed stating "Okay.  I will tell Len."

Id. ¶¶ 6-7.  Universal has not produced an affidavit from Coughlin describing his conversation with Falco.  CSI has produced an affidavit in which Falco describes his conversation with Coughlin in the following way:

> On February 9, 2010, Mr. Coughlin of Universal contacted me regarding increases in fuel prices and Universal's alleged need to impose a fuel surcharge.

---

[1] The parties consistently refer to what appears to be a proposed rate increase as a fuel surcharge.  The court follows their usage.

> In response, I explained to him that - based upon my
> review of Universal's three rate quotes for the
> hauling of Concrete Systems goods - the third rate
> quote (the May 2009 Agreement whereby Universal agreed
> to haul Concrete Systems' goods for $1,360.00 per load
> as long as the price of fuel was below $2.22 per
> gallon) should have actually been $ 1,360 per load as
> long as fuel prices remained below $3.22.  Otherwise,
> Universal's first rate quote ($1,475 per load as long
> as fuel costs remained below $4.35 per gallon) and
> second rate quote ($1,430 as long as fuel costs
> remained below $3.80 per gallon) - which Concrete
> Systems rejected because they were too high - would
> have been better deals for Concrete Systems.  Based on
> my analysis, Concrete Systems would have saved
> approximately $25,000 if it accepted an earlier rate
> quote.  This is in contrast to Universal's
> representation that the third rate quote was better
> than the second rate quote, which had allegedly been
> better than the first.  In hindsight, I felt that
> Universal's rate quotes were misleading.  I informed
> Mr. Coughlin that I would have to confer with Mr.
> Worden, the president of the company, regarding the
> proposed fuel surcharge.  However, throughout my
> conversation with Mr. Coughlin, I never agreed that
> Concrete Systems would pay the fuel surcharge.  In
> fact, I expected Universal to acknowledge that the
> $2.22 fuel cost limit was an error and should have
> been set at $3.22.

Falco Aff. (doc. no. 18-1) ¶ 7.  Based on the foregoing, Falco

did not contest Universal's right to a higher rate per load once

fuel prices hit a certain ceiling; he merely indicated his

belief that fuel prices had not yet reached the agreed-upon

ceiling.

Universal agrees with CSI that there is a factual dispute

over whether CSI agreed to the fuel surcharge in the February 9

telephone call.[2]  It is undisputed, however, that after
Coughlin's conversation with Falco, Falco spoke with Worden,
with the following result:

> [A]fter it was informed that Universal would be
> unilaterally imposing a fuel surcharge, CSI determined
> that it would not pay such a fuel surcharge because it
> never agreed to pay such a fuel surcharge.  This was a
> decision reached by Mr. Worden after being advised of
> the conversation between Mr. Falco and Mr. Coughlin on
> or about February 9, 2010.

Mot. Summ. J., Ex. B (doc. no. 17-3), at 8.[3]  Falco never got
back in touch with Coughlin to report the outcome of his
conversation with Worden.

On March 17, Boussie e-mailed John Perry, who was then
employed by CSI as an accounts payable/accounts receivable
assistant.[4]  Boussie wrote to inquire about several January
invoices that had not been paid and three more invoices that she
characterized as having been "paid short."  With respect to the

_____

[2] Universal is being generous to itself on this point.  In
its memorandum of law, it asserts that Falco agreed to the fuel
surcharge, but has produced no admissible evidence of Falco's
agreement.  CSI, on the other hand, has produced Falco's sworn
statement that he did not agree to the surcharge.  Thus, there
is no factual question to try.  See Meuser, 564 F.3d at 515.

[3] It is not clear whether CSI's decision not to pay "such a
fuel surcharge" was a decision not to pay a surcharge triggered
by fuel prices above $2.22 per gallon, or a decision not to pay
any surcharge at all.  Fortunately, that distinction does not
appear to be material, which relieves the court of the task of
determining which of the two permissible inferences is more
favorable to CSI.

[4] Perry died in April of 2011.  See Mot. Summ. J., Ex. B
(doc. no. 17-3), at 12.

short-paid invoices, Boussie wrote: "Also, there are a few invoices that are paid short.  Can you tell me the breakdown on payment for the following invoices?"  Pl.'s Reply, Ex. A, Second Boussie Aff. (doc. no. 20-1), at 4.  Boussie then listed three invoice numbers.  Perry responded:

> 4150561-00 & 4130707-00, were short paid in my error in entering them.  I will enter the balance due on these 2 invoices.
>
> Invoice 4141342-00 should have been for 1360.00, the fuel surcharge was in effect on 2/09/10 this invoice is dated 2/01/10 please credit the $204.00.

Id.  In an affidavit, Boussie characterizes her communications with Perry:

> I . . . contacted Mr. Perry at CSI and inquired as to why the fuel surcharge was not paid.  Mr. Perry replied via e-mail that CSI would not be paying the fuel surcharge prior to February 9, 2010 but would be paying the fuel surcharge after February 9, 2010.
>
>        . . . .
>
> I believe I also had telephone calls consistent with the e-mail exchange whereby Mr. Perry stated that CSI was not willing to pay the fuel surcharge prior to the date Mr. Falco and Mr. Coughlin spoke (February 9, 2010), but that it was Mr. Perry's mistake in not paying the fuel surcharge for the entire month of February with the fuel surcharge subsequent to February 9.  I believe I apologized for mistakenly sending invoices for the entire month of February with the fuel surcharge and Mr. Perry apologized for not sending the fuel surcharge for all invoices from February 9, 2010 forward.

First Boussie Aff. (doc. no. 17-2) ¶¶ 10, 12.

By check dated March 26, 2010, CSI paid the fuel surcharge

on invoices 4150561 and 4130707.  <u>See</u> Second Boussie Aff. (doc.

no. 20-1) ¶ 3.  CSI, however, never again paid the surcharge.

Rather, it paid $1,360 each for the next 275 loads Universal

hauled.[5]  Universal hauled its last load for CSI on April 5,

2010.  <u>See</u> Mot. Summ. J., Ex. D (doc. no. 17-5), at 23.  There

is no specific evidence in the record to indicate when CSI was

invoiced for the loads Universal hauled after February 9, nor is

there specific evidence to indicate when CSI paid those

invoices.  There is, however, evidence that as a general matter,

Universal sent invoices thirty days or more after a load was

---

[5] In a truly odd twist, Universal, which bases its claim on
CSI's failure to pay the surcharge, criticizes CSI for "mak[ing]
the unsupported factual assertion in its Objection that '[CSI]
paid Universal $1,360.00 for each of the nearly 275 loads
delivered after February 9, 2010, but did not pay Universal the
$204 fuel surcharge for the hauling of [CSI]'s goods between
February 2010 and April 2010.'"  Pl.'s Reply (doc. no. 20), at 3
n.2.  Not to be outdone, CSI responds by submitting an affidavit
declaring, "[u]pon information and belief" that for the 275
loads at issue, it did not pay the $204 surcharge.  <u>See</u> Def.'s
Surreply, Siryk Aff. (doc. no. 25-1) ¶ 4.  Of course, "[i]t is
apodictic that an affidavit . . . upon from information and
belief . . . does not comply with Rule 56(e)."  <u>Perez v. Volvo
Car Corp.</u>, 247 F.3d 303, 315 (1st Cir. 2001) (quoting <u>Sheinkopf
v. Stone</u>, 927 F.2d 1259, 1271 (1st Cir. 1991)).  It would seem
equally true that where Universal's claim rests on CSI's failure
to pay the surcharge, CSI may supportably base a legal argument
on its failure to pay without having to produce evidence of that
failure.  Or, if Universal takes the position that CSI's failure
to pay the surcharge is a disputed issue of fact, it is
difficult to see how it could possibly be entitled to summary
judgment on any claim premised on CSI's failure to pay the
surcharge.

hauled, and that CSI paid those invoices up to thirty days after it received them.  <u>See</u> Second Boussie Aff. (doc. no. 20-1) ¶ 2.

The third and final communication between Universal and CSI on the subject of the fuel surcharge took place in late May of 2010.[6]  Specifically, in a May 27, 2010, telephone conversation, "Mr. Coughlin insisted that he was entitled to a fuel surcharge and Mr. Worden insisted that CSI never agreed to pay <u>any</u> fuel surcharge and was not obligated to do so."  Mot. Summ. J., Ex. B (doc. no. 17-3), at 19 (emphasis added).

Based on the foregoing, Universal sued CSI for breach of contract, quantum meruit, restitution/unjust enrichment, attorney's fees and costs, and violation of the CPA.  CSI has counterclaimed for violation of the CPA, breach of the implied covenant of good faith and fair dealing, and negligent and/or intentional misrepresentation.

## Discussion

Universal moves for summary judgment on all five of its claims and all three of CSI's counterclaims.  CSI objects,

---

[6] In its interrogatory answers, CSI stated its belief that there were no significant communications between Universal and CSI concerning the fuel surcharge other than: (1) the February 9 telephone conversation between Coughlin and Falco; (2) the late-March telephone and e-mail communications between Boussie and Perry; and (3) a May 27, 2010, telephone conversation between Coughlin and Worden.  <u>See</u> Mot. Summ. J., Ex. B (doc. no 17-3), at 5.

categorically.  The court considers each of the eight claims in turn.

### A. Universal's Breach-of-Contract Claim

In Count I of its amended complaint, Universal states the following claim for breach of contract:

> In January or February 2010, through authorized employees and agents with actual authority, Universal entered into an Agreement with CSI or modified its existing Agreement with CSI wherein CSI agreed to pay certain hauling costs and a fuel surcharge for every load hauled by Universal for CSI.
>
> . . . .
>
> CSI materially breached this agreement by failing and refusing to pay the agreed upon fuel surcharge on 275 invoices and by failing and refusing to pay any portion of four other invoices.

Am. Compl. ¶¶ 21, 23.[7]  Universal moves for summary judgment on that claim.  CSI objects, arguing that it never agreed to pay any surcharge.  Because it appears to be undisputed that CSI paid a fuel surcharge on, at most two loads, but see note 5, supra, resolution of this claim hinges on whether the undisputed factual record demonstrates that CSI agreed to pay Universal an additional $204 per load for the loads it hauled after February 9.  The record demonstrates no such thing.

"A valid, enforceable contract requires offer, acceptance, consideration, and a meeting of the minds."  Tessier v.

---

[7] Universal does not claim that CSI breached the May 2009 agreement.

Rockefeller, 162 N.H. 324, 339 (2011) (quoting Durgin v. Pillsbury Lake Water Dist., 153 N.H. 818, 821 (2006)).  "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."  Restatement (Second) of Contracts § 24 (1981).

According to Universal, Coughlin's February 9 conversation with Falco included an offer to continue hauling CSI's loads in exchange for CSI's payment of a fuel surcharge of $204 per load. Universal argues that CSI accepted that offer, and thus agreed to pay the surcharge, in one of three ways: (1) by Falco expressly agreeing to do so when he spoke with Coughlin; (2) by Perry ratifying Falco's agreement in his communications with Boussie; or (3) by accepting Universal's services without ever rejecting its offer.  CSI contends that: (1) Falco did not understand Coughlin to be making an offer to modify the agreement between Universal and CSI and did not agree to pay the surcharge; (2) Perry did not have the authority to bind CSI to an agreement to pay the surcharge; and (3) it actively demonstrated its rejection of the surcharge by continuing to pay only $1,360 per load.

The problem with Universal's claim for breach of contract is that it hinges on Coughlin's having made an offer to Falco during the February 9 telephone conversation, and Universal has

12

produced no admissible evidence of that.  Universal has produced evidence of what Boussie says Coughlin told her he had told Falco.  But, since Boussie does not claim to have been an ear-witness to Coughlin's side of his conversation with Falco,[8] her testimony is not admissible to prove what Coughlin said to Falco.

Even if Boussie were competent to provide evidence about what Coughlin said to Falco, what she reports in her affidavit is not exactly an offer to CSI.  In its memorandum of law, Universal cites paragraph six of Boussie's affidavit as evidence supporting the proposition that "Mr. Coughlin explained [to Falco] that due to the increases in the price of fuel past the $2.22 agreed upon price that CSI would need to pay a fuel surcharge of $204 per load if CSI wanted Universal to continue hauling its goods."  Pl.'s Mem. of Law (doc. no. 17-1), at 4 (emphasis added).

The portion of Boussie's affidavit on which Universal relies, however, says only this: "On or about February 9, 2010, I was informed by Steve Coughlin that a 15% percent fuel surcharge was to be added to CSI's invoices going forward." First Boussie Aff. (doc. no. 17-2) ¶ 6.  Conspicuously absent from paragraph six is any mention of a quid pro quo, or a threat

---

[8] To the contrary, Boussie expressly says that Coughlin told her about his conversation with Falco after the fact.  See First Boussie Aff. (doc. no. 17-2) ¶ 6.

by Universal to stop hauling CSI's concrete forms if CSI did not agree to pay the surcharge.  Nowhere in her affidavit does Boussie say that Coughlin told her that he told Falco that Universal was willing to enter into a bargain under which it would continue to haul CSI's goods if CSI agreed to pay the surcharge.  Rather, Boussie says that she "was later informed by Mr. Coughlin that . . . he told CSI that it would be necessary to institute a fuel surcharge."  First Boussie Aff. (doc. no. 17-2) ¶ 7.  That sounds more like a demand or the announcement of a unilateral decision than an offer to modify the parties' existing agreement.  Moreover, CSI has produced Falco's sworn statement that he did "not recall Mr. Coughlin stating that Universal would stop hauling [CSI]'s goods if [CSI] did not agree to pay a fuel surcharge."  Falco Aff. (doc. no. 18-1) ¶ 7.

Without an offer, there was, necessarily, nothing for CSI to accept or reject.  Thus, there is no need for the court to address the three modes of acceptance that Universal posits.  Rather, because Universal has failed to produce undisputed evidence that it even made an offer to CSI, it is not entitled to summary judgment on the claim for breach of contract stated in Count I of its amended complaint as that claim relates to payment of the surcharge on the last 275 loads Universal hauled.

Universal also claims that CSI breached the agreement between the parties by failing to pay any portion of four

invoices.  CSI says it never received three of those invoices,

and concedes that there "may be a few minor accounting

discrepancies between the records of Universal and CSI that need

to be adjusted."  Mot. Summ. J., Ex. B (doc. no. 17-3), at 20.

Given those factual disputes, Universal is not entitled to

summary judgment on this portion of its claim for breach of

contract.

### B. Universal's Quantum-Meruit Claim

In Count II, Universal seeks to recover $89,158.98 under

the equitable theory of quantum meruit.

> A valid claim in quantum meruit requires [that]: . . .
> (1) services were rendered to the defendant by the
> plaintiff; (2) with the knowledge and consent of the
> defendant; and (3) under circumstances that make it
> reasonable for the plaintiff to expect payment.

Gen. Insulation Co. v. Eckman Constr., 159 N.H. 601, 612 (2010)

(quoting Paffhausen v. Balano, 708 A.2d 269, 271 (Me. 1998)).

"Quantum meruit, also sometimes labelled 'contract implied in

fact,' involves recovery for services or materials provided

under an implied contract."  Paffhausen, 708 A.2d at 271 (citing

Aladdin Elec. Assocs. v. Town of Old Orchard Beach, 645 A.2d

1142, 1145 (Me. 1994); United States ex rel. Modern Elec., Inc.

v. Ideal Elec. Sec. Co., 81 F.3d 240, 246 (D.C. Cir. 1996)).

The problem with Universal's quantum-meruit claim, as

stated in Count II of its amended complaint, is the way

Universal attempts to establish the third element.  In Universal's view, the circumstance that made it reasonable to expect payment of the fuel surcharge from CSI was CSI's February 9 agreement to pay it.  In other words, rather than asking the court to imply a contract, under principles of quantum meruit, Universal asks the court to award relief, under principles of quantum meruit, based on CSI's alleged breach of the February 9 agreement.  Accordingly, it does not appear that Universal has even stated a claim in quantum meruit.

CSI responds to Universal's motion for summary judgment by: (1) stating the rule that "[r]ecovery in quantum meruit presupposes that no valid contract covers the subject matter of a dispute," MCI WorldCom Commc'ns, Inc. v. Dep't of Telecomms. & Energy, 810 N.E.2d 802, 812 (Mass. 2004) (quoting Boswell v. Zephyr Lines, Inc., 606 N.E.2d 1336, 1342 (Mass. 1993));[9] and (2) contending that the May 2009 agreement is a valid contract covering the subject matter of the dispute, i.e., the amount it was obligated to pay Universal.  Universal fires back:

> Pursuant to the express terms of the original
> contract, Universal was only required to haul CSI's
> goods if the price of fuel was under $2.22 per gallon.
> Whereas it is undisputed that the price of fuel had

---

[9] "Where such a contract exists, the law need not create a quantum meruit right to receive compensation for services rendered."  Boswell, 606 N.E.2d at 1342 (citations omitted).

> risen above $2.22 per gallon after February 9, 2010,
> the original contract was no longer binding.

Pl.'s Reply (doc. no. 20), at 2.

One thing is certain: the May 2009 agreement is not a valid contract that obligated Universal to haul CSI's goods for $1,360 per load when the price of fuel was more than $2.22 per gallon. By its express terms, the May 2009 agreement obligated Universal to haul CSI's goods for $1,360 per load only "as long as the fuel stay[ed] at a level under $2.22 per gallon."  Falco Aff., Ex. A (doc. no. 18-1), at 11 (emphasis added).  Thus, there are only two things that could have happened when the price of fuel rose above $2.22 per gallon: (1) the May 2009 agreement remained in force, but with a missing term, i.e., the cost per load when the price of fuel was above $2.22 per gallon;[10] or (2) the May 2009 agreement terminated and Universal hauled every single one of CSI's loads without a contract and subject to remuneration under the principles of quantum meruit.

So, here is where we are.  Universal disclaims the existence of the May 2009 agreement, which it very likely could prove CSI breached, and seeks, instead, to recover either for

---

[10] In that scenario, the cost per load would be a reasonable rate, as determined by the court.  See Restatement (Second) of Contracts § 204 (1981) ("When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.").

the breach of an agreement that never came into existence (i.e.,
the February 9 agreement/modification), or under an equitable
theory that comes into play only in the absence of an
enforceable agreement.  CSI, in turn, attempts to deny Universal
the benefit of quantum meruit by insisting on the existence of a
contract it is probably liable for breaching but which does not
figure in Universal's breach-of-contract claim.

    In the end, the court can only adjudicate the claims
brought by the parties.  In Count II, Universal seeks to recover
under a theory that applies only in the absence of an agreement
covering the subject matter of the dispute.  Here, the subject
matter of the dispute is the amount Universal is due for hauling
CSI's loads.  That subject matter is covered by the May 2009
agreement, which sets the cost per load at $1,360 when the price
of fuel is less than $2.22, and which leaves for future
determination the cost per load when the price of fuel is
greater than $2.22.[11]  Because there is an agreement that covers
the subject matter of the dispute, Universal is not entitled to
recover under a theory of quantum meruit.  Accordingly, as to
Count II, Universal's motion for summary judgment is denied.

---

    [11] Negotiating a new cost per load in February of 2009 would
have been one mode of future determination.  Under the
circumstances of this case, the Restatement provides for future
determination by the court.  See Restatement (Second) of
Contracts § 204.  Of course, it is still not too late for the
parties to resolve this issue themselves.

### C. Universal's Unjust-Enrichment Claim

The claim for unjust enrichment stated in Count III of Universal's amended complaint, under which it seeks $89,158.98, is nearly identical to the claim stated in Count II.  In essence, Universal asserts that CSI was unjustly enriched by breaching its agreement to pay the fuel surcharge.  That is not a claim for unjust enrichment; it is a claim for breach of contract.  Accordingly, as to Count III, Universal is not entitled to summary judgment.

### D. Universal's CPA Claim

In Count V, Universal asserts that "CSI engaged in unfair and deceptive practices within the meaning of the [consumer protection] act by agreeing in a telephone call on February 9, 2010 and in an e-mail on March 17, 2010 that they [sic] would pay the fuel surcharges when CSI had no intent of actually paying those fuel surcharges."  Am. Compl. ¶ 49.   In its motion for summary judgment, Universal shifts gears.

It does not argue that CSI agreed to pay the surcharge, as it alleged in its complaint.  Rather, Universal describes CSI as deceptively allowing it to believe that CSI intended to pay the surcharge, while knowing that it had no intention of doing so. In support of that argument, Universal points to two things: (1) CSI's failure to expressly state its objection to paying the

fuel surcharge until long after the last load was hauled; and
(2) Perry's statements to Boussie that CSI, in fact, intended to
pay the surcharge for loads delivered after February 9.  As
legal support for its revamped CPA claim, CSI relies on Milford
Lumber Co. v. RCB Realty, Inc., 147 N.H. 15 (2001), for the
proposition that a buyer violates the CPA by accepting goods for
which it has no intention of paying.

In its objection, CSI does not challenge the applicability
of the legal principles stated in Milford Lumber.  Rather, it
argues it never led Universal to believe that it intended to pay
the fuel surcharge and then identifies three areas of factual
dispute that preclude summary judgment.  Specifically, it
asserts that: (1) Falco never agreed to pay the fuel surcharge;
(2) CSI demonstrated its rejection of the fuel surcharge by
paying the underlying hauling fee but not the fuel surcharge;
and (3) John Perry did not have authority to approve CSI's
payment of the disputed fuel surcharge.

As a preliminary matter, Universal is certainly not
entitled to summary judgment on the CPA claim stated in Count V
of the amended complaint.  Universal has produced no evidence
that Falco ever agreed that CSI would pay the surcharge.
Regarding Perry's alleged agreement that CSI would pay the
surcharge – as opposed to his agreement to pay a bill arising
under a contract he understood to have been entered into by his

superiors – Universal has produced no evidence that Perry had
the authority to bind CSI to an agreement, and CSI has produced
uncontested evidence that he had no such authority.  See Def.'s
Obj., Ex. C, Siryk Aff. (doc. no. 18-3) ¶ 2.  Thus, Universal is
not entitled to summary judgment on its CPA claim, as stated in
Count V.

Universal's motion for summary judgment, however, describes
a different, and much stronger, CPA claim based on Milford
Lumber.  In that case, "the plaintiff agreed to supply building
materials to the defendants."  147 N.H. at 16.  Six months into
the plaintiff's performance under the agreement, its invoices
were going unpaid.  See id.  Then:

> When the plaintiff telephoned Berube to discuss the
> payment schedule, Berube indicated that there was a
> communication problem between Howe and Berube
> regarding the invoices.  It was agreed the invoices
> would thereafter be sent directly to Berube. . . .
>
> The plaintiff's problems receiving payment did
> not abate, despite repeated efforts to communicate
> with both Berube and his wife, Leslie.  Whenever the
> plaintiff contacted Berube, Berube gave assurances
> that he was in control of the funds and would arrange
> for full payment.  That never happened.  In fact,
> despite repeatedly asking for invoices and assuring
> payment, Berube eventually asserted that he was not
> responsible for payment, and the plaintiff should seek
> payment from Howe.

Id.  Based on the foregoing facts, the trial court granted the
plaintiff judgment on its CPA claim.  See id.  In affirming, the
New Hampshire Supreme Court explained:

21

We have held that "[a]n ordinary breach of
contract claim does not present an occasion for the
remedies under the Consumer Protection Act." Barrows
[v. Boles], 141 N.H. [382,] 390 [(1996)].  The
defendants, however, did not simply fail to pay
invoices.  Rather, they made intentionally vague
representations regarding their relationship with Howe
to facilitate the use of Howe's account with the
plaintiff to procure lumber for the Windsor Heights
project.  Then, the defendants used those same
misrepresentations as a basis for completely
disclaiming liability for the goods.  It would be
harmful for commerce in New Hampshire to allow such
unethical and unscrupulous activity to occur.  The
legislature promulgated the Act to protect citizens
engaged in commerce from this type of activity.

Id. (parallel citation omitted).

The CPA violation in Milford Lumber was the defendants'

giving the plaintiff the run-around when the plaintiff tried to

get paid for the deliveries it had made to the defendants.  If

CSI engaged in the passive equivalent of the Milford Lumber run-

around, i.e., intentionally waiting until after Universal had

delivered the last load of the job to tell Universal that it had

decided back in February not to pay any surcharge while acting

as if it had agreed to the surcharge, then Universal might have

a viable CPA claim.

The problem for Universal at this stage is the summary

judgment standard, which requires the court to resolve all

reasonable inferences in CSI's favor.  See Meuser, 564 F.3d at

515.  On the record before the court, there is undisputed

evidence that: (1) during the February 9 telephone call, Falco

did not absolutely deny CSI's obligation to pay an increased
rate for hauling, but merely disputed Universal's position
regarding the fuel-price ceiling that triggered its obligation
to do so; (2) Falco told Coughlin that he needed to discuss the
issue with Worden, who is the CSI representative with whom
Coughlin negotiated the May 2009 agreement; (3) Falco never got
back to Coughlin at all, and thus did not tell Coughlin that
Worden had decided not to pay the surcharge; (4) in late March
of 2010, CSI paid the surcharge on two invoices, and Perry told
Boussie that he had initially failed to pay the surcharge by
mistake; and (5) after paying the surcharge on two invoices, CSI
never again paid it.[12]

From the foregoing facts, one could reasonably infer that
CSI decided in February of 2010 not to pay anything more than
$1,360 per load but kept that decision to itself until late May,
in order to keep the trucks rolling without an interruption for
renegotiation.  One could also infer, reasonably, that Falco
never got back to Coughlin because he believed his February 9
conversation effectively communicated a defensible basis for not

---

[12] Neither party appears to have produced any evidence
concerning the timing of the invoices containing the fuel
surcharge that CSI did not pay.  Given that Boussie and Perry
were resolving issues related to February invoices in late
March, it is possible that CSI's first refusal to pay the
surcharge came after the last load was hauled in early April,
which would blunt CSI's argument that it effectively
communicated its rejection of the surcharge by not paying it.

paying the surcharge until fuel prices reached $3.22 – which they never did at any time before Universal hauled its last load for CSI.  Regarding Perry's payment of the surcharge on two invoices, it is at least as reasonable to infer that he did so by mistake as it is to infer that he was instructed to pay the surcharge on a few invoices to deter Universal from pressing the issue until after the job was finished.

The bottom line is this.  While Universal's revised CPA claim is viable and might be compelling to a jury, a CPA violation is not the only thing that may reasonably be inferred from the undisputed evidence.  Accordingly, Universal is not entitled to summary judgment on Count V.

### E. CSI's CPA Claim

In Count I of its counterclaim, CSI asserts that Universal violated the CPA in two ways.  First, it claims that after it rejected Universal's first two offers ($1,475 per load as long as fuel prices remained below $4.35 per gallon, and $1,430 per load as long as fuel prices remained below $3.80 per gallon), Universal came back with an even worse offer ($1,360 per load as long as fuel prices remained below $2.22 per gallon), which it falsely represented to be a better offer.  More specifically, CSI alleges that "Universal engaged in unfair and deceptive practices within the meaning of the [Consumer Protection] Act by

preparing misleading quotes to CSI which appeared to be
advantageous to CSI but [which] were, in fact, structured to
inure solely to the benefit of Universal by significantly
increased [sic] shipping costs above the base rate proposed."
Answer & Countercl. (doc. no. 11) ¶ 90.  According to CSI, it
"has paid approximately $25,000 more in shipping costs for this
project than it otherwise would have, had Universal properly
explained the pricing proposals it provided to CSI."  Id. ¶ 87.
In its view, "[h]ad Universal more fairly and transparently
provided CSI with appropriate and fair price information, CSI
would have been able to negotiate a price with Universal that
was at least $25,000 less than what [CSI] otherwise paid."  Mot.
Summ. J., Ex. B (doc. no. 17-3), at 21.  In short, CSI argues
that Universal violated the CPA by deceptively inducing it to
enter into an agreement based on the disadvantageous third
offer, as opposed to the more advantageous second offer.  In
addition to asserting that Universal misrepresented the benefit
of its offers, CSI also asserts that Universal violated the CPA
by waiting until February of 2010 – midway through the job – to
assert its right to be paid more than $1,360 per load.

     Universal is entitled to summary judgment on both aspects
of CSI's CPA claim.  In the analysis that follows, the court
first describes the CPA and then turns to each of the two
asserted grounds for CPA liability, beginning with CSI's claim

based on Universal's conduct in February of 2010 and concluding with CSI's claim based on Universal's conduct leading up to the parties' May 2009 agreement.

### 1. The CPA

The CPA lists fifteen unlawful acts, and further provides that the list is not exclusive.  See RSA 358-A:2.  "For conduct not particularized by the CPA to qualify as unfair or deceptive, it must be of the same type as that proscribed in the enumerated categories."  State v. Sideris, 157 N.H. 258, 262 (2008) (citing State v. Moran, 151 N.H. 450, 452 (2004)).  When determining whether conduct not specifically listed in the CPA falls within the ambit of the statute, the New Hampshire Supreme Court has "employed the 'rascality' test," under which "the objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce."  George v. Al Hoyt & Sons, Inc., 162 N.H. 123, 129 (2011) (citing Sideris, 157 N.H. at 263; ACAS Acqs. (Precitech) Inc. v. Hobert, 155 N.H. 381, 402 (2007)).

### 2. Universal's Conduct in February of 2010

With regard to Universal's conduct in February of 2010, CSI asserts:

> CSI believes that Universal has attempted to use its
> economic leverage to force CSI to pay the fuel
> surcharge.  In the middle of the project, Universal

> sought to unilaterally calculate and then impose a
> fuel surcharge without ever negotiating the issue with
> CSI and without any contractual basis to do so.

Answer & Countercl. (doc. no. 11) ¶ 91.  CSI does not, however, expressly base its CPA claim on any of the fifteen unlawful acts enumerated in RSA 358-A:2.

Assuming that CSI's factual allegations are true, the conduct CSI describes is not specifically proscribed by the CSA and bears no resemblance to any of the conduct that statute does proscribe.  The CPA regulates the tools sellers may use to entice buyers, not the way contracting parties must treat each other once they have agreed to enter into a business relationship.  Cf. George, 162 N.H. at 129 ("An ordinary breach of contract claim, for example, is not a violation of the CPA.") (quoting Sideris, 157 N.H. at 262).  Finally, even if Universal's attempt to impose the fuel surcharge did somehow run afoul of the CPA, CSI itself steadfastly insists that it never paid the surcharge, which pretty well eviscerates any claim that Universal forced CSI to do anything.  Accordingly, to the extent CSI's CPA claim is based on Universal's conduct in February of 2010, Universal is entitled to judgment as a matter of law.

### 3. Universal's Pre-Agreement Conduct

The heart of CSI's CPA claim is its assertion that Universal tricked it into accepting the most disadvantageous of

its three offers.  As a preliminary matter, the court is puzzled

by CSI's characterization of the third offer as less

advantageous than the first two.  On the face of it, the third

offer had the lowest cost per load, which would seem to be a

good thing for CSI.  Moreover, in the context of its defense

against Universal's breach of contract claim, CSI argues,

vigorously, that the third offer did not include any provision

allowing Universal to negotiate for a higher cost per load in

the event the price of fuel went above $2.22.  That, too, sounds

advantageous to CSI.  Still, CSI contends that if only Universal

had "properly explained" its pricing proposals, thus revealing

how bad its third offer was, CSI would have negotiated a better

deal.[13]

In his affidavit, Falco refers to an analysis he performed

after the parties entered into the May 2009 agreement that

demonstrated that the third offer was worse than the second one

---

[13] That is pure speculation, and CSI does not indicate what
form its speculative better deal might have taken.  There are
three possibilities, a fixed cost per load untied to a fuel-
price ceiling, a higher fuel-price ceiling, or a lower cost per
load.  There is nothing in the parties' course of dealing to
suggest that Universal would have entered into an agreement that
did not tie the cost per load to a fuel-price ceiling or that
included a fuel-price ceiling so high that it would not have
kicked in under the circumstances of this case.  Moreover, it
seems beyond dispute that if the parties had known that fuel was
going to cost around $2.80 a gallon when Universal was hauling
CSI's goods, which is the only "information" CSI was lacking
when it accepted Universal's third offer, Universal would not
have agreed to a cost per load less than the $1,360 it offered
to accept when fuel cost $2.18 per gallon.

because, under the second offer, CSI would have saved nearly $25,000.  That analysis is encapsulated in Exhibit D of Universal's motion for summary judgment.  Exhibit D shows that if CSI had accepted Universal's second offer, it would have incurred $652,080 in shipping costs (based on 456 loads at $1,430 per load), while Universal now seeks a total of $676,160 in shipping costs (based on 182 loads at $1,360 per load and 274 loads at $1,564 per load).

The obvious problem with CSI's characterization of the third offer as less advantageous than the second one, for purposes of assessing Universal's conduct at the point of contract formation, is that CSI's analysis is entirely retrospective.  The third offer was not less advantageous when it was made, but only became so later, when the price of fuel increased.  Had the price of fuel stayed below $2.22 per gallon then, necessarily, the third offer would have been more advantageous than the second one.  In other words, there was no way of knowing, in May of 2009, which of Universal's three offers would turn out to be the better deal for CSI, and by entering into an agreement with a cost per load tied to a fuel-price ceiling, CSI plainly chose to bear the risk of an increase in fuel prices.  It could have avoided that risk by refusing to enter into an agreement that tied the cost per load to a fuel-price ceiling, but it did not do so.  In any event, based on the

information available to both parties in May of 2009, it seems inapt to call the third offer less advantageous than the other two; it only became a worse deal after fuel prices went up, which would seem to sink any of CSI's claims based on misrepresentation.  That said, the court turns to the main part of CSI's CPA claim.

As noted, CSI does not expressly base its CPA claim on any of the fifteen unlawful acts enumerated in RSA 358-A:2.  The closest the CPA comes to addressing Universal's pre-agreement conduct is its prohibition against "[r]epresenting that goods or services have . . . characteristics . . . benefits, or qualities that they do not have."  RSA 258-A:2, V.  If CSI is making a claim under RSA 358-A:2, V, there are several problems.  To begin, while CSI characterizes Universal's quotes as deceptive or misleading, it does not identify any characteristic or quality of the shipping rate that Universal cleverly camouflaged.  This is not a case about hidden fees or undisclosed charges; Universal seeks to be paid more than $1,360 per load based on the occurrence of a contingency clearly contemplated by the parties' agreement, i.e., fuel prices above $2.22 per gallon.  Not only does CSI fail to identify what Universal hid from it, it does not suggest what Universal should have said to make its offers less misleading, or how Universal could have more "properly explained" its pricing proposals.

With regard to CSI's characterization of the offer it accepted
as lacking transparency, the offer was no less opaque in May of
2009 than it is now, which placed the onus on CSI to resolve any
transparency issues before it accepted the offer.[14]

Universal said how much it wanted per load, indicated the
fuel-price ceiling under which it was willing to accept that
rate, and knew from its course of dealing that CSI knew that the
United States Department of Energy published fuel prices each
week.  Whether the arrangement Universal proposed was
advantageous to CSI was not a quality inherent in the quote but,
rather, a decision for CSI to make.  Finally, to the extent that
CSI is claiming to have been victimized by a disadvantageous
offer passed off as advantageous, the court notes that the e-
mails communicating the second and third offers did not purport
to assess how advantageous the terms of those offers might be to
CSI.  Rather, they expressed a hope that the offers would be

---

[14] Surely CSI cannot be claiming that Universal is liable
under the CPA because, in May of 2009, it did not predict the
price of fuel from November of 2009 through April of 2010 and/or
warn CSI against accepting an offer with a cost per load tied to
a fuel-price ceiling.  The future price of fuel was not a fact
about which Universal could have made any representation, and
with respect to the possibility that the price of fuel could go
up, Universal adequately represented that "fact" by prefacing
its second and third offers with commentary about dropping fuel
prices and by consistently tying its costs per load to a fuel-
price ceiling.

advantageous to CSI,[15] but represented only that they were based

on reduced fuel costs[16] and that they were advantageous to

Universal.[17]  In sum, if CSI is claiming that Universal

misrepresented the quality or the benefits of its offer, in

violation of the CPA, Universal is entitled to judgment as a

matter of law.

If, on the other hand, CSI is relying on the rascality test

rather than RSA 358-A:2, V, Universal is still entitled to

judgment as a matter of law.  Universal made three successive

offers to CSI.  Each included a cost per load and a fuel-price

ceiling under which the quoted rate applied.  When the price of

fuel was in the vicinity of $4.20 per gallon, the fuel-price

ceiling in the rate quote was $4.35.  When the price of fuel was

in the vicinity of $3.50 per gallon, the ceiling in rate quote

_____

[15] In its second offer, Universal said: "we . . . hope that the reduction will be enough to secure this movement for both of our companies."  Falco Aff., Ex. A (doc. no 18-1), at 7.

[16] Universal prefaced its second offer by referring to "the recent drop in Fuel Prices," Falco Aff., Ex. A (doc. no. 18-1), at 7, and prefaced its third offer by referring to "conditions in the transportation industry as a whole" and "reduced fuel costs and the overall economy."  Id., Ex. B, at 11.  Universal did not suggest that it reduced the proposed cost per load because it was trying to do CSI any favors.

[17] Universal referred to its second offer as including a price reduction "we can make," Falco Aff., Ex. A (doc. no. 18-1), at 7, and described the rate stated in the third offer as something Universal was "comfortable" with, id., Ex. B, at 11.  Thus, while Universal suggested that the second and third offers were good deals for it, Universal offered no opinion as to whether those offers were good for CSI.

was $3.80.  When the price of fuel was $2.185 per gallon, the
ceiling in the rage quote was $2.22.  The pattern is evident; in
each rate quote, Universal set the fuel-price ceiling slightly
above the then-current price of fuel.  And, in each of its
quotes, Universal referred to the DOT's weekly fuel-price
postings, thus giving CSI ample opportunity to learn the basis
for the fuel-price ceilings in the quotes.  CSI was free to
accept or reject any of Universal's three offers.  The court
cannot discern even a hint of rascality surrounding the process
by which Universal provided CSI with quotes and the court
rejects, as a matter of law, the theory that the CPA required
Universal to predict the future price of fuel or warn CSI about
the risks of entering into an agreement with a cost per load
that was tied to a fuel-price ceiling.  If CSI wanted to avoid
those risks, it could easily have done so by rejecting
Universal's third offer.

To conclude, because the undisputed factual record
establishes that Universal did not violate the CPA, Universal is
entitled to summary judgment on Count I of CSI's counterclaim.

### F. CSI's Good-Faith-and-Fair-Dealing Claim

In Count II of its counterclaim, CSI asserts that Universal
breached the implied covenant of good faith and fair dealing in
the following ways:

Universal breached this covenant by providing
misleading quotes at the outset and deceiving CSI as
to the "true" costs of the alleged quotes.

Universal later breached this covenant by failing
to honor the terms of the agreement by attempting to
exert its economic leverage to force CSI to pay a fuel
surcharge when none was ever agreed to by the parties.

Answer & Countercl. (doc. no. 11) ¶¶ 96-97.  Universal is

entitled to judgment as a matter of law on Count II of CSI's

counterclaim.

"There is 'not merely one rule of implied good faith duty

in New Hampshire's law of contract, but a series of doctrines,

each of them speaking in terms of an obligation of good faith

but serving markedly different functions.'"  J & M Lumber &

Constr. Co. v. Smyjunas, 161 N.H. 714, 724 (2011) (quoting

Centronics Corp. v. Genicom Corp., 132 N.H. 133, 139 (1989);

citing Birch Broad. v. Capitol Broad. Corp., 161 N.H. 192, 198

2010)).  "The various implied good-faith obligations fall into

three general categories: (1) contract formation; (2)

termination of at-will employment agreements; and (3) limitation

of discretion in contractual performance."  J & M Lumber, 161

N.H. at 724 (citing Livingston v. 18 Mile Point Drive, Ltd., 158

N.H. 619, 624 (2009)).  CSI makes claims under the first and

third categories.  Both may be dispatched in relatively short

order.

With regard to the first category, "the implied good faith obligations of a contracting party are tantamount to the traditional duties of care to refrain from misrepresentation and to correct subsequently discovered error, insofar as any representation is intended to induce, and is material to, another party's decision to enter into a contract in justifiable reliance." Centronics, 132 N.H. at 139 (citing Bursey v. Clement, 118 N.H. 412, 414 (1978)).  In Count II of its counterclaim, CSI accuses Universal of "providing misleading quotes" and "deceiving [it] as to the 'true' costs of the alleged quotes."  Answer & Countercl. ¶ 96.  CSI does not, however, allege what, exactly, was misleading about the quotes, or how it was deceived by them.

Moreover, as explained above, because the "true" costs of the quotes were not ascertainable facts at the time Universal gave them, but only became evident later, based on the price of fuel, CSI has not even stated a claim under the contract-formation category.  Universal had a good-faith obligation not to misrepresent facts to CSI; it had no obligation to predict future fuel prices, counsel CSI as to the consequences of entering into an agreement with a cost per load tied to a fuel-price ceiling (which were equally ascertainable to both parties), or make CSI an offer that insulated it from increased shipping costs in the event fuel prices rose.  Accordingly, to

the extent Count II asserts that Universal violated its good-faith obligations at the point of contract formation, Universal is entitled to judgment as a matter of law.

In Centronics, the New Hampshire Supreme Court characterized the third category of good-faith obligations this way:

> [U]nder an agreement that appears by word or silence to invest one party with a degree of discretion in performance sufficient to deprive another party of a substantial proportion of the agreement's value, the parties' intent to be bound by an enforceable contract raises an implied obligation of good faith to observe reasonable limits in exercising that discretion, consistent with the parties' purpose or purposes in contracting.

Id. at 143.  As that court has explained more recently:

> While the third category is comparatively narrow, its broader function is to prohibit behavior inconsistent with the parties' agreed-upon common purpose and justified expectations as well as "with common standards of decency, fairness and reasonableness."

Birch Broadcasting, 161 N.H. at 198 (quoting Livingston, 158 N.H. at 624).

There are several problems with CSI's claim as it relates to Universal's conduct in February of 2010.  First, the agreement between Universal and CSI was not one that "ostensibly . . . confer[ed] upon [Universal] a degree of discretion in performance tantamount to a power to deprive [CSI] of a substantial proportion of the agreement's value," Centronics, 132 N.H. at 144, which is a necessary prerequisite to the kind

36

of claim CSI is making, see id. at 144-45.  Beyond that,

Universal did not deprive CSI of any of the contract's value; it

is undisputed that Universal hauled 456 loads of CSI's concrete

forms, all of them when the price of fuel was above $2.22 and

approximately 275 of them after Universal informed CSI of its

need for an increase in the cost per load.  Where the agreement

did not obligate Universal to haul a single load when the price

of fuel was above $2.22, yet Universal did so, and only sought

to increase the cost per load prospectively, after hauling 175

loads for $1,360, it is difficult to see how CSI can even begin

to argue that Universal's conduct failed to comport "with common

standards of decency, fairness and reasonableness," Birch

Broadcasting, 161 N.H. at 198 (citation omitted).  Thus,

Universal is also entitled to judgment as a matter of law on the

portion of Count II based on Universal's performance under the

agreement.

### G. CSI's Misrepresentation Claim

In Count III of its counterclaim, CSI asserts that

Universal is liable for negligent or intentional misrepresenta-

tion because it "misrepresented the true costs and risks of its

various proposals and deceived CSI into believing subsequent

proposals were move 'favorable' to CSI."  Answer & Countercl. ¶

100.

"The elements of . . . a claim [for negligent misrepresentation] are a negligent misrepresentation of a material fact by the defendant and justifiable reliance by the plaintiff." Wyle v. Lees, 162 N.H. 406, 413 (2011) (citing Snierson v. Scruton, 145 N.H. 73, 78 (2000)).  With respect intentional misrepresentation:

> "'[O]ne who fraudulently makes a misrepresenta-
> tion . . . for the purpose of inducing another to act
> or to refrain from action in reliance upon it, is
> subject to liability to the other in deceit for
> pecuniary loss caused to him by his justifiable
> reliance upon the misrepresentation.'" Gray v. First
> NH Banks, 138 N.H. 279, 283 (1994) (quoting
> Restatement (Second) of Torts § 525, at 55 (1977)).
> . . .  "In order to withstand a motion to dismiss, the
> plaintiff must specify the essential details of the
> fraud, and specifically allege the facts of the
> defendant's fraudulent actions." Jay Edwards, Inc. v.
> Baker, 130 N.H. 41, 46-47 (1987) (brackets and
> quotation omitted).

Tessier, 162 N.H. at 331-32 (parallel citations omitted).

While CSI claims that Universal "misrepresented the true costs of its various proposals," Answer & Countercl. ¶ 100, it nowhere alleges anything Universal said about the true costs or risks of its proposals, nor does it indicate what Universal should have said.  Rather, the undisputed evidence is that Universal presented its proposals, indicated that it found the proposed terms beneficial to itself, and expressed its hope that CSI would also find them beneficial.  As for "true costs," Universal made no representation about what the price of fuel

would be in the future and, consequently, gave CSI no assurance
that fuel prices would not go above the ceiling in the
agreement.  As for risks, each proposal was quite clear that the
cost per load proposed therein only applied when fuel prices
remained below a stated ceiling.  The risk that the quoted rate
might not apply was expressed plainly on the face of proposals,
and CSI was free to assess that risk and determine whether it
was willing to bear it, or needed some other contractual term to
provide greater protection against fuel-price increases.
Finally, as to CSI's assertion that it had been "deceived into
believing subsequent proposals were more 'favorable' to CSI,"
Answer & Countercl. ¶ 100, CSI does not indicate what Universal
said or did that was deceptive.  More importantly, whether a
given proposal was "favorable" to CSI was a decision for CSI to
make, not a factual matter over which Universal had special
knowledge superior to CSI's.  There is simply no legal principle
that makes a seller of goods or services responsible for
determining whether a proposed sale is beneficial to the buyer;
all the law requires is for the seller to fairly and accurately
describe the qualities of its products and the terms of its
offer.  On the undisputed facts of this case, Universal
fulfilled that obligation.

In sum, without any alleged false statement by Universal,
CSI has failed to state a claim for either negligent or

intentional misrepresentation.  Accordingly, Universal is entitled to summary judgment on Count III of CSI's counterclaim.

### H. Universal's Claim for Attorney's Fees

Count V is Universal' request for the attorney's fees it incurred in pressing the claims stated in Counts I-III and V, under the principles stated in Harkeem v. Adams, 117 N.H. 687 (1977) and Keenan v. Fearon, 130 N.H. 494 (1988).  As Universal has not prevailed on any of its claims against CSI, it has not "secur[ed] [any] clearly defined and established right, which should have been freely enjoyed without [judicial] intervention," Harkeem, 117 N.H. at 691, which means that there is no basis for an award of attorney's fees on those claims, see In re State & Estate of Crabtree, 155 N.H. 565, 576-77 (2007) (citation omitted).

In its motion for summary judgment, Universal characterizes CSI's counterclaims as frivolous, and asks for an award of the reasonable costs and attorney's fees it incurred in defending against them.  In New Hampshire, "[a]ttorney's fees may be awarded as compensation . . . for those who are forced to litigate against an opponent whose position is patently unreasonable."  Emerson v. Town of Stratford, 139 N.H. 629, 632 (1995) (quoting Maguire v. Merrimack Mut. Ins. Co., 133 N.H. 51, 55 (1990)).  CSI's three counterclaims are exceptionally weak.

Of that, there is no doubt.  However, they appear to fall, ever so slightly, on the non-fee-paying side of the line that separates ill-advised claims from claims made "in bad faith, vexatiously, wantonly, or for oppressive reasons," Emerson, 139 N.H. at 632 (quoting Harkeem, 117 N.H. at 691).  Accordingly, Universal is not entitled to attorney's fees for defending against CSI's counterclaims.

### Conclusion

For the reasons described above, Universal's motion for summary judgment, document no. 17, is granted in part and denied in part.  Specifically, Universal is not entitled to summary judgment on any of its five claims, but is entitled to summary judgment on all three of CSI's counterclaims.

SO ORDERED.

_____
Landya McCafferty
United States Magistrate Judge


February 22, 2012

cc:  Matthew R. Johnson, Esq.
     Brian R. Moushegian, Esq.
     Marc R. Scheer, Esq.
     Michael J. Tierney, Esq.