```
                 UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF NEW HAMPSHIRE
```

Universal Am-Can, Ltd.

    v.                                            Civil No. 11-cv-030-LM
                                                   Opinion No. 2012 DNH 115

CSI-Concrete Systems, Inc.


**O R D E R**

After a two-day trial, the jury in this civil action rendered a verdict in favor of CSI-Concrete Systems, Inc. ("CSI") on the breach-of-contract claim asserted against it by Universal Am-Can, Ltd. ("Universal"). The jury also rendered an advisory verdict in favor of Universal on its equitable claim for quantum meruit and found damages of $13,475. Before the court for final resolution are Universal's quantum-meruit claim and its claim under New Hampshire's Consumer Protection Act ("CPA"), N.H. Rev. Stat. Ann. ("RSA") ch. 358-A. For the reasons that follow, the court finds and rules that Universal is entitled to $13,475 in damages on its claim for quantum meruit, and that CSI is entitled to judgment on Universal's CPA claim.

### Quantum Meruit

"A valid claim in quantum meruit requires [that]: . . . (1) services were rendered to the defendant by the plaintiff; (2) with the knowledge and consent of the defendant; and (3) under

circumstances that make it reasonable for the plaintiff to expect payment." Gen. Insul. Co. v. Eckman Constr., 159 N.H. 601, 612 (2010) (quoting Paffhausen v. Balano, 708 A.2d 269, 271 (Me. 1998)).

CSI first argues that Universal has not even met the necessary prerequisite for making a quantum-meruit claim, i.e., the lack of a valid contract covering the subject matter of the parties' dispute. That argument is not persuasive. The Supreme Judicial Court of Massachusetts has explained that "[r]ecovery in quantum meruit presupposes that no valid contract covers the subject matter of a dispute." MCI WorldCom Commc'ns, Inc. v. Dep't of Telecoms. & Energy, 802 N.E. 2d 802, 812 (Mass. 2004) (quoting Boswell v. Zephyr Lines, Inc., 606 N.E.2d 1336, 1342 (Mass. 1993)). In CSI's view, Universal's agreement to haul its goods for $1,360 per load "so long as the fuel stays at a level under $2.22 per gallon," Pl.'s Ex. 1, was a valid contract that covered the subject matter of the dispute. CSI is mistaken. The subject matter of the dispute is the amount CSI was obligated to pay Universal for hauling the last 275 loads of the job. Those loads were all hauled at times when the cost of fuel was more than $2.22 per gallon. The contract between Universal and CSI only obligated Universal to haul CSI's goods for $1,360 per load when fuel cost less than $2.22 per gallon. As much as

CSI might wish it had entered into a fixed-price contract, it did not do so.  For reasons best understood by the parties themselves, they entered into an agreement that did not establish a rate for loads hauled when fuel cost $2.22 per gallon or more.  Because there was no valid contract that covered the subject matter of the dispute, i.e., the rate for hauling CSI's goods when fuel cost $2.22 per gallon or more, Universal has established the prerequisite for a quantum-meruit claim described in MCI WorldCom.  Accordingly, the court turns to the elements of Universal's claim.

   Universal hauled 275 loads of CSI's concrete forms after February 9, 2010, and CSI concedes that Universal has established the first element of a claim for quantum meruit.  There is no dispute that those loads were hauled with the knowledge and consent of CSI, which satisfies the second element.  CSI argues that Universal has not established that element because it, CSI, did not consent to payment of the fuel surcharge.  But that is not the question.  The question is whether Universal rendered services to CSI with CSI's knowledge and consent, and there is no reasonable argument to be made that CSI did not know about or consent to Universal hauling the last 275 loads of its job.  Without CSI's knowledge and consent, Universal's drivers would not have been able to pick up the

concrete forms they hauled to Milwaukee.  That leaves the third element of Universal's quantum-meruit claim.

Based on the evidence presented at trial, the court concludes that Universal hauled CSI's goods under circumstances that made it reasonable for Universal to expect payment of more than $1,360 per load.  Those circumstances include the following: (1) the agreement between Universal and CSI specified that the rate per load would be $1,360 <u>only</u> if the cost of fuel remained below $2.22 per gallon; (2) in mid February of 2010, the cost of fuel was approximately $2.76 per gallon; (3) when Steven Coughlin of Universal spoke with CSI's Louis Falco on February 9, to inform CSI of his decision to impose a fuel surcharge of $204 per load, Falco did not assert that the parties had a fixed-price contract or deny that the rate per load was subject to a fuel-cost ceiling;[1] and (4) after Coughlin broached the issue of a fuel surcharge with Falco, Coughlin was not informed by CSI, until after the last load had been delivered, that CSI was not going to pay the fuel surcharge Universal had been including on its invoices.  Under those circumstances, it was reasonable for Universal, at the time it

---

[1] Rather, he attempted to convince Coughlin that the parties had agreed to a fuel-cost ceiling of $3.22 per gallon rather than the $2.22 per gallon stated in Coughlin's e-mail of May 2009.

hauled the final 275 loads of CSI's job, to expect payment by CSI of some amount in excess of $1,360 for each of those loads.

CSI responds by arguing that "[t]he evidence submitted at trial demonstrates that it was unreasonable for Universal to expect payment of the disputed fuel surcharge." Def.'s Obj. (doc. no. 67), at 5. In support of that argument, CSI notes evidence that: (1) Falco did not agree to the surcharge; (2) Coughlin waited until after the job was finished to raise the issue with CSI's Len Worden; and (3) CSI's John Perry was not authorized to agree to the surcharge. Whether it was reasonable for Universal to expect payment of the $204-per-load fuel surcharge is beside the point. The question is whether it was reasonable for Universal to expect to be paid some amount in excess of $1,360 for hauling each of the last 275 loads of the job. And, for the reasons the court has already given, that was a reasonable expectation.

Because CSI is liable to Universal in quantum meruit, the only issue that remains is the amount of Universal's damages. "In quantum meruit . . . the damages are not measured by the benefit realized and retained by the defendant, but rather are based on the value of the services provided by the plaintiff." Paffhausen, 708 A.2d at 271 (citing William Mushero, Inc. v. Hull, 667 A.2d 853, 855 (Me. 1995) ("The measure of recovery is

equal to the reasonable value of the services."); Siciliani v. Connolly, 651 A.2d 386, 387 (Me. 1994)).

In the opinion of the jury, Universal is entitled to $13,475. Universal moves for an award in one of three amounts: (1) $56,100, which equals the $204-per-load surcharge Universal attempted to impose, multiplied by 275 loads; (2) $89,158.98, the amount of the expenses Universal says Falco determined it incurred as a result of increased fuel costs; or (3) $113,401.50, the total amount of the fuel surcharge Louisiana Pacific would have imposed on the last 275 loads of CSI's job. CSI, in turn, argues that because none of Universal's theories has adequate evidentiary support, any award of quantum-meruit damages should be limited to the $13,475 suggested by the jury.

Based on its own independent review of the evidence presented at trial, the court adopts the damages calculation performed by the jury. With regard to the jury's calculation, Universal argues that "it appears that the jury took the $89,158.89 figure that CSI determined was the increased cost to Universal and multiplied it by 15% to get to $13,475." Pl.'s Mot. for Damages (doc. no. 63) ¶ 5. To support that argument, Universal "further assume[s] that the jury, not having calculators in the deliberation room, rounded up to $90,000.00 and then took off $25.00 [from $13,500] to come to a round

number of $13,475.00."[2]  Id. n.1  Rather than speculating about what the jury might have done, it seems more sensible to focus on what the jury actually did do, which was to award Universal an additional $49 per load for the last 275 loads it hauled for CSI.

An extra $49 per load falls comfortably within the range of what is reasonable.  Awarding Universal the full surcharge it sought to impose, $204 per load, would result in CSI paying $1,564 per load for loads delivered at a time when the cost of fuel was approximately $2.90 per gallon.  Yet, in its first offer to CSI, Universal was willing to do the job for $1,475 per load, so long as fuel cost less than $4.35 per gallon.[3]  And in its second offer, Universal was willing to do the job for $1,430 per load, so long as fuel cost less than $3.80 per gallon.  If Universal was willing to do the job for $1,430 per load with fuel at $3.80 per gallon, the court has little trouble concluding that with the cost of fuel running approximately ninety cents per gallon below $3.80, a rate of $1,409 per load

---

[2] Going from $13,475 to $13,500 would be rounding; going from $13,500 to $13,475 seems more like sharpening.

[3] Universal's own offers, in turn, are compelling evidence of the value Universal placed on the services it proposed to render and did render to CSI.

7

($1,360 plus $49) is a reasonable value for Universal's services, based on Universal's previous bids.

To be sure, there is a reasonable basis for awarding more in quantum-meruit damages. But, at the same time, there is evidence in the record from which a reasonable factfinder could make a smaller award. Under Universal's first offer, which was $1,475 per load so long as the cost of fuel remained less than $4.35 per gallon, Universal was willing to do the job for $396 per load over fuel costs.[4] Under Universal's second offer, which was $1,430 per load so long as the cost of fuel remained less than $3.80 per gallon, Universal was willing to do the job for $488 over fuel costs.[5] Assuming an average fuel cost of approximately $2.90 per gallon during the time when Universal hauled the 275 loads at issue, its drivers' fuel costs were $719 per load. At a rate of $1,360 per load, Universal was paid $641 per load over the cost of fuel. That is less than the $809 over fuel costs Universal would have realized if the cost of fuel had remained at $2.22 per gallon, but it is $245 per load more than

---

[4] If each trip was 1116 miles, and a truck gets 4.5 miles per gallon, then each trip required 248 gallons of fuel. With fuel costing $4.35 per gallon, the ceiling stated in Universal's first offer, the fuel for each load would have cost $1,079, leaving a margin of $396 over fuel costs.

[5] With fuel costing $3.80 per gallon, the ceiling stated in Universal's second offer, the fuel for each load would have cost $942, leaving a margin of $488 over fuel costs.

Universal was willing to accept under its first offer and $153 per load more than it was willing to accept under its second offer. Given the amount Universal was able to make while charging $1,360 per load, there is a good argument to be made that an award of less than $49 per load would have been reasonable.

The jury's award of $49 per load leaves Universal in a better position than it would have been in under either of its first two offers. Thus, the jury's award of $13,475 falls within the range of what is reasonable, given the facts of this case. Accordingly, the court adopts the jury's advisory verdict and awards Universal $13,475 in damages on its claim for quantum meruit.

## Consumer Protection Act

Both parties have submitted requests for findings of fact and rulings of law regarding Universal's Consumer Protection Act claim, which was tried to the court. Rather than dealing with those requests individually, the court will render its decision in narrative form, with the understanding that the parties' requests for findings of fact and rulings of law are granted or denied, as is consistent with the following discussion of Universal's claim.

Under New Hampshire's CPA, "[i]t shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." RSA 358-A:2. The balance of RSA 358-A:2 consists of a non-exclusive list of fourteen unlawful acts.

Universal describes the conduct underlying its CPA claim in the following way:

   a. Keeping silent after receiving and reviewing 275 invoices with a fuel surcharge[.]

   b. Having an employee pay the fuel surcharge on 2 of the invoices to lead Universal to believe that it would be paid on others[.]

   c. Having a low level employee say that the fuel surcharge would be paid so that Universal would think that it would be paid but CSI could later disclaim this low level employee's statements as unauthorized[.]

   d. Paying all of the invoices up to February 8th so as to hide the fact that the fuel surcharge on post-February 9, 2010 invoices would not be paid[.][6]

   e. Waiting until the last load of the job to tell Universal it did not intend to pay the fuel surcharge[.]

---

[6] The court has some difficulty understanding the factual basis for this point; the March 17, 2010, e-mail exchange between Melissa Boussie and John Perry occurred precisely because CSI paid a batch of invoices that included at least two for loads delivered on or after February 9, which is why Boussie and Perry concluded that Universal was owed the fuel surcharge for those loads.

Pl.'s Req. for Findings & Rulings (doc. no. 65), at 9. None of the conduct on which Universal bases its CPA claim falls into any of the categories listed in the statute.

> For conduct not particularized by the CPA to qualify as unfair or deceptive, it must be of the same type as that proscribed in the enumerated categories. State v. Moran, 151 N.H. 450, 452 (2004). Although the general provision of the CPA is broadly worded, not all conduct in the course of trade or commerce falls within its scope. ACAS Acquisitions v. Hobert, 155 N.H. 381, 402 (2007).

State v. Sideris, 157 N.H. 258, 262 (2008) (parallel citations omitted). Moreover:

> In determining which commercial actions not specifically delineated are covered by the act, [the New Hampshire Supreme Court has] employed the "rascality" test. [Sideris, 157 N.H.] at 263. Under the rascality test, the objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce. Hobert, 155 N.H. at 402.

George v. Al Hoyt & Sons, Inc., 162 N.H. 123, 129 (2011) (parallel citations omitted).

Here, if CSI violated the CPA at all, it did so under principles enunciated by the New Hampshire Supreme Court in its opinion in Milford Lumber Co. v. RCB Realty, Inc., 147 N.H. 15 (2001). In Milford Lumber, "the plaintiff agreed to supply building materials to the defendants." Id. at 16. It did so, even as its invoices were going unpaid. See id. To resolve the payment problem, the plaintiff contacted one of the defendants,

11

who initially gave assurances that the invoices would be paid, but later asserted that he was not responsible for payment, and directed the plaintiff to seek payment from his business partner, one John Howe. See id.

After pointing out that "[a]n ordinary breach of contract claim does not present an occasion for remedies under the Consumer Protection Act," Milford Lumber, 147 N.H. at 19 (quoting Barrows v. Boles, 141 N.H. 382 (1996)), the court held that in the case before it,

> [t]he defendants . . . did not simply fail to pay invoices.  Rather, they made intentionally vague representations regarding their relationship with Howe to facilitate the use of Howe's account with the plaintiff to procure lumber for the Windsor Heights project.  Then, the defendants used those same misrepresentations as a basis for completely disclaiming liability for the goods.  It would be harmful for commerce in New Hampshire to allow such unethical and unscrupulous activity to occur.

Id. at 19-20.  In affirming the trial court's decision that the defendants violated the CPA by giving the plaintiff the run-around when it attempted to collect what it was owed, the New Hampshire Supreme Court endorsed the trial court's use of the following standard for determining whether a defendant's conduct violates the CPA:

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise – whether, in other words, it is within at least the penumbra of some common-law

>     statutory or other established concept of unfairness;
>     (2) whether it is immoral, unethical, oppressive, or
>     unscrupulous; (3) whether it causes substantial injury
>     to consumers (or competitors or other businessmen).

Id. at 19 (quoting FTC v. Sperry & Hutchinson Co., 405 U.S. 233, 244-45 n.5 (1972)).

Based on the foregoing authority, and the evidence adduced at trial, the court concludes that CSI did not violate the CPA. Both the CPA itself and Milford Lumber make clear that the purpose of the CPA is to prevent unfairness and deception in commercial transactions. To bring this case within the ambit of Milford Lumber, Universal would have to prove deliberate actions or statements by CSI that were designed to mislead Universal into believing that CSI was going to pay the disputed surcharge when, in fact, it had no intention of doing so. That is, Universal must prove that CSI tricked it into hauling the remainder of CSI's loads. Universal has failed to prove the requisite level of chicanery on CSI's part.

To begin, there is no evidence that Perry was directed by anyone at CSI either to pay any surcharges or to tell Melissa Boussie that CSI planned to pay the surcharge for all loads delivered after February 9. Both Falco and Worden testified that they did not discuss the February 9 telephone call from Coughlin to Falco with anyone else at CSI. Boussie testified that it was possible that she was the source of Perry's

knowledge of the surcharge and the date on which Universal believed it went into effect. Based on the trial testimony, the court finds that: (1) Coughlin told Falco of his decision to impose the fuel surcharge on February 9; (2) Coughlin told Boussie about the February 9 telephone call; (3) Falco told Worden about the call, but neither of them said anything to Perry about it, Falco believing that the fuel-cost ceiling had not yet been hit, and Worden believing (albeit erroneously) that CSI had a fixed-price contract with Universal; (4) Boussie, believing that the fuel surcharge was a done deal, told Perry that several invoices had been short-paid, because the fuel surcharge had been left out of CSI's payment; and (5) Perry, accepting Boussie's statements about the fuel surcharge, paid it for two loads.

Perry may well have given Boussie the impression that CSI intended to pay the fuel surcharge,[7] but he did so mistakenly, not as part of a grand design to deceive Universal. With regard to Universal's alternative scenario, i.e., that Perry's superiors told him to pay the surcharge on two loads and to

---

[7] Moreover, there is no evidence that Boussie ever told Coughlin about her March 17 e-mail exchange with Perry; Coughlin testified at trial that the sole basis for his belief that CSI had agreed to pay the fuel surcharge was his telephone conversation with Falco. In other words, there is no evidence that anyone at Universal with decision-making authority ever relied on Perry's e-mails as a basis for deciding to continue to haul CSI's goods.

represent that it would be paid going forward, the court notes that Universal's version of the facts would be substantially more convincing if Perry had paid the surcharge when it was initially billed, rather than doing so in response to Boussie's inquiry over a short payment.

Without direct evidence that CSI directed Perry to pay the fuel surcharge or represent that it would be paid going forward (and in the face of direct evidence that CSI did not do those things), Universal's CPA claim rests on little more than a chronology of events that, in its view, establishes CSI's intent to mislead it into believing that CSI planned to pay the fuel surcharge.  While CSI's silence in the face of 275 invoices that included the fuel surcharge, and the fact that it did not expressly state its refusal to pay the fuel surcharge until after the last load had been hauled, could be considered mildly suspicious, the court also notes that Universal was similarly lax in the way it handled its side of things.  It did not even resort to the semi-formality of e-mail to introduce the fuel surcharge to CSI.  Coughlin sought payment of the surcharge from Falco rather than Worden, to whom he had directed the three bids that led to the contract between Universal and CSI.  And, after Falco's somewhat ambiguous response to the February 9 telephone call, Coughlin did not follow up with Falco or contact Worden

until long after the last load had been hauled.  Based on the evidence, the court concludes that what we have here is not some nefarious plot by CSI to deceive Universal but, rather, the predictable result of two businesses with different expectations and understandings, who heard what they wanted to hear when the other spoke,[8] and who dealt perhaps too informally with matters of substantial financial consequence to both of them.  The reality here is that: (1) Universal erroneously believed it was entitled to an extra $204 per load after February 9; (2) CSI erroneously believed it had a fixed-price contract with Universal; and (3) when the February 9 telephone call resulted in nothing approaching clarity, finality, or actual agreement, each party chose, at least implicitly, to whistle past the graveyard, believing what it wanted to believe, hoping that things would work out in the end.  Now that the day of reckoning has arrived, one thing is certain: the aftermath of both

---

[8] On this score, Falco and Worden both construed Coughlin's May 2009 e-mail as proposing a fixed-price contract by reading out the phrase "as long as the fuel stays at a level under $2.22 per gallon national average as posted each Monday by the D.O.E." Pl.'s Ex. 1.  Meanwhile, Coughlin understood Falco to be agreeing to the fuel surcharge when he said "O.K., I'll tell Len" or "O.K., I'll have to tell Len."  Acceptance of the fuel surcharge is one possible interpretation of what Falco said but, if he was accepting the surcharge, one wonders why he felt the need to say anything to Coughlin about the conversation he planned to have with Worden.

parties' casual business practices does not give rise to a CPA claim.

To prove a CPA claim under Milford Lumber, a supplier of goods or services must demonstrate that its customer, through intentional statements or acts, misled it into believing that payment was forthcoming when, in fact, the customer had no intention of paying the supplier.  While the evidence is clear that Worden had a low opinion of fuel surcharges, had no intention of paying the surcharge Universal attempted to impose, and sincerely held the erroneous belief that CSI had a fixed-price contract with Universal, Universal has not proven, by a preponderance of the evidence, that CSI intended to deceive Universal into thinking that it was going to pay the fuel surcharge for all loads hauled after February 9, 2010.  Accordingly, CSI is entitled to judgment in its favor on Universal's CPA claim.

## Conclusion

For the reasons described above, the court finds and rules that Universal is entitled to damages in the amount of $13,475 on its quantum meruit claim, and that CSI is entitled to judgment in its favor on Universal's CPA claim.  The clerk of

the court shall enter judgment in accordance with this order and close the case.

    SO ORDERED.

                                        _____
                                        Landya McCafferty
                                        United States Magistrate Judge

July 5, 2012

cc:   Matthew R. Johnson, Esq.
      Brian R. Moushegian, Esq.
      Marc R. Scheer, Esq.
      Michael J. Tierney, Esq.